# United States District Court

_____ MIDDLE _____ DISTRICT OF _____ ALABAMA _____

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

448 County Road 68 E
Deatsville, Alabama, is a white trailer with tan trim,
patio porch on the front of the trailer facing County Road 68.

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER:  *2:07mj 103-WC*

I _____ Devin Whittle _____ being duly sworn depose and say:

I am a(n) _____ Special Agent, Drug Enforcement Agency _____ and have reason to believe
Official Title

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

448 County Road 68 E, Deatsville, Alabama

in the _____ MIDDLE _____ District of _____ ALABAMA _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)
See Attachment B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
property that constitutes the fruits, evidence, and instrumentalities of crimes against the United States,

concerning a violation of Title __21__ United States Code, Section(s) __841(a)(1)__.
The facts to support a finding of Probable Cause are as follows:

See Attached Affidavit hereby incorporated by reference as if fully restated herein.

Continued on the attached sheet and made a part hereof.  ☒ Yes  ☐ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

__November 7, 2007__          at   __Montgomery, Alabama__
Date                                         City and State

__Wallace Capel Jr., United States Magistrate Judge__
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

AFFIDAVIT IN SUPPORT OF APPLICATION
ATTACHMENT A

I, Devin L. Whittle, Special Agent of the United States Department of Justice, Drug Enforcement Administration (DEA) being duly sworn, depose and state as follows:

1.    Your affiant is a Special Agent with the Drug Enforcement Administration (DEA). I am currently employed with the United States Drug Enforcement Administration (DEA), and have been so employed for the past eleven (11) years. I am currently assigned to the New Orleans Division, the Montgomery District Office, the High Intensity Drug Trafficking Area (HIDTA) Task Force. Prior to becoming a Special Agent, I was a Montgomery, Alabama, Police Officer for eight (8) years. I have worked exclusively on narcotics investigations for eighteen (18) years. I have investigated criminal violations of the Federal controlled substance laws, including, but not limited to, investigations involving smuggling of controlled substances, distribution of controlled substances in violation of Title 21, United States Code, Section 841; and laundering of the proceeds derived from the sale of controlled substances.

2.    I have conducted and participated in investigations that have resulted in the seizure of illegal drugs

1

including, but not limited to, multiple kilogram quantities of cocaine, multi-kilogram quantities of marijuana, multi-kilogram quantities of methamphetamine, large quantities of LSD and Methylenedioxymethamphetamine (MDMA), various designer drugs that are controlled substances, and millions of dollars in illegal drug proceeds. I am familiar with, and have participated in all of the normal methods of investigation, including, but not limited to, foot, auto, air and electronic surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the use of pen registers, trap and traces, cellular telephone cite tracking, mobile tracking devices, the use of undercover agents, and the identification of co-conspirators through the use of drug ledgers, telephone records and bills, photographs and financial records.

3.    I have received training in investigations involving the interception of wire communications. I have also participated in investigations involving the interception of wire communications and of electronic communications of digital display paging devices. I am familiar with the ways in which narcotics traffickers conduct their business, including, but not limited to, their methods of importing and distributing narcotics, their use of telephones, cellular telephones and digital display paging devices and their use of numerical codes and code words to conduct their transactions. I have

participated in numerous searches, pursuant to consents as well as warrants, for narcotics and other related drug trafficking contraband during my twenty years in law enforcement; in said searches, narcotics as well as currency, ledgers, logs, books, documents evidencing drug dealing and assets, pagers, cellular phones, and other electronic devices (computers, fax machines) have been found.

4.    Based on my training, experience, and participation in investigations of traffickers in large quantities of methamphetamine and marijuana in the United States, in the tracings of proceeds on transactions involving illegal narcotics and in uncovering smuggling and distribution of illegal narcotics, I know that:

a.    Large scale narcotics traffickers must keep on hand large amounts of United States Currency in order to maintain and finance their ongoing drug business.

b.    Drug traffickers very often place their assets in the names of others, including parents, spouses, and children to avoid detection of these assets by law enforcement.

c.    Even though these assets are in other persons' names, the drug traffickers' continue to use these assets and exercise control over them.

3

d.    Drug traffickers encounter tremendous problems handling large sums of U.S. currency through financial institutions because of the currency transaction report which is required to be completed and filed with the Internal Revenue Service any time cash transactions exceed $10,000, which causes them to maintain large amounts of cash in other, easy to access, but secure places (such as safe deposit boxes and safes).

e. Drug traffickers maintain telephone books, both personal and electronic, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the importation, transportation, ordering, sale, purchase, and distribution of controlled substances.

f. These aforementioned telephone books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers are stored and readily available to the drug traffickers in their houses, storage sheds, rental houses, safes, banks, safety deposit boxes and places of business.

g. It is common for large scale drug traffickers to secrete contraband, including controlled substances, proceeds from drug sales, including personal items, electronic items such as televisions, VCR's, stereos, and records of drug transactions in secure locations such as

4

safes, lock boxes, safety deposit boxes in their names and relatives' names for ready access, and to conceal them from law enforcement.

**h.** Persons involved in drug trafficking conceal in secure locations, with ease of access, large amounts of currency, financial instruments and evidence for financial transactions relating to the obtaining, transfer, secreting and spending of large sums of money    obtained        from engaging in drug trafficking activities.

**i.** When drug traffickers amass large amounts of money from trafficking in illegal drugs, they attempt to hide their illegal origin. In order to accomplish this, they use banks, cashiers checks, money drafts, real estate and business fronts.

**j.** Documents relating to such attempts to hide the illegal origin of such proceeds are kept where the traffickers have ready access to them, often in their houses or structures over which they have control, places of business, and often in close proximity to illegal drugs.

**k.** It is common for drug traffickers to travel to major source of narcotics cities such as El Paso, Phoenix, and other cities located near the Mexican/American border to receive drugs. These methods of transportation include commercial airlines, commercial vessels, private

aircraft,    rental    vehicles,    and    other    means    of transportation.

l.    It is common for drug traffickers to keep and maintain records of their travels in locations for easy access such as their residences, places of business and other structures over which they exercise control.

m.    Drug traffickers commonly maintain addresses or phone numbers in books, papers, compact electronic telephone books which show names, addresses, and/or telephone numbers for associates in the trafficking organization, and they keep such records in their homes, places of business or other structures over which they exercise control.

n.    Drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs; they usually keep these photographs in their homes or places of business with other drug related documents.

o.    Drug traffickers often maintain and utilize cellular phones and pagers to facilitate drug trafficking. It is common for these communication devices to be listed in other persons' names.    However, drug traffickers continue to use these devices and maintain control over them.    Drug traffickers keep billing records for these

6

mobile phones and pagers in their homes or businesses or other structures over which they exercise control so they are readily accessible.

**p.** It is common for drug traffickers to use cellular phones, fax machines, pay phones, and long distance calling card services to avoid detection and interception by law enforcement agents.

5. This affidavit is made in support of an application to search 448 County Road 68 E, Deatsville, Alabama and to seize books, records, receipts, papers, notes, cash, ledgers, photographs, travel documents, personal telephone books, bank records, and other papers relating to the sale, purchase, and distribution of controlled substances in violation of Title 21 United States Code 841 (a)(1), and 846. I am also seeking evidence of occupancy and ownership of premises, and the location of any drug stash locations. The information in the paragraphs below which is furnished in support of this application, comes in part from agents and officers of the Drug Enforcement Administration (DEA), DEA Task Force Agents, Deputies of the Autauga County, Alabama Sheriff's Department and other Law Enforcement Agencies and by the analysis of surveillance, information from reliable

informants, pen register information, and intercepted telephone calls, the use of public records, as well as searches of criminal justice background indices concerning the narcotics trafficking activities of Ronnie Dale NOBLE and his associates.

7.    I have investigated and I continue to investigate a drug distribution operation headed by Danny and Vera EVANS, Ronnie Dale NOBLE, other known and unknown individuals.  This organization is responsible for the distribution of multi-pound quantities of methamphetamine and marijuana in the Middle District of Alabama.

8.  448 County Road 68 E, Deatsville, Alabama is a white trailer with tan trim, patio porch on the front of the trailer facing County Road 68.  The facts tending to support these claim are as follows:

9.    On January 23, 2007, CS#1 contacted Autauga County, Alabama Deputy Sheriff Ty Jones with intelligence regarding Ronnie Dale NOBLE.  Your affiant is aware of the fact that CS#1 has a criminal history.  In January of 2004, CS#1 was arrested by the Jefferson, Georgia Police Department and charged with

8

manufacture/sell/dispense/distribute         methamphetamine,
possession of tools for committing of a crime, transaction
in drug related objects and acquiring license plate to
conceal vehicle identification.    Further, on February 18,
2005, charges of violation of the Georgia controlled
substance act were dismissed.    On January 3, 2007, CS#1 was
arrested after being found in possession of a small amount
of methamphetamine and a shot gun.    As a result of these
charges, CS#1 agreed to cooperate with law enforcement.
(NOTE:   CS#1 ceased his cooperation in April of 2007) Your
affiant is aware of the fact CS#1 has worked with agents to
make controlled purchases methamphetamine from Ronnie Dale
NOBLE. Your affiant is aware of the fact that CS#1 has
provided reliable intelligence regarding Ronnie Dale NOBLE
and other members of his methamphetamine trafficking
organization.    CS#1 advised Deputy Jones that CS#1 was at
NOBLE'S residence, which according to CS #1, is located at
448 County Road 68 E in Deatsville, Alabama.    While there,
CS#1 observed NOBLE counting money believed to be drug
proceeds.    CS#1 stated that CS#1 observed NOBLE count
approximately $12,000.00.

    10.   In January of 2007, CS#1 provided information to
DEA Task Force Agent Joe Herman.    CS#1 stated that on

9

January 21, 2007, at about 1:00pm, CS#1, Ronnie NOBLE, and Tom CAMPBELL were at 82 Auto Parts in Prattville, Alabama where NOBLE'S truck was being repaired. CS#1 stated that CS#1 overheard a cellular telephone conversation between NOBLE and Steven CATON. According to CS#1, the call involved details of how CATON was going to get $10,000.00 to be used for the purchase of methamphetamine to NOBLE. Further, CS#1 stated that NOBLE told CATON to take the money to NOBLE'S residence (448 County Road 68 E, Deatsville, Alabama) where NOBLE'S daughter, Natalie, would take custody of the money. CS#1 stated that on same date at about 6:00pm; CS#1 and NOBLE went back to NOBLE'S residence (448 County Road 68 E, Deatsville, Alabama) where NOBLE retrieved currency that was banded in $2,000.00 bundles from the safe located in NOBLE'S bedroom. According to CS#1, NOBLE then counted the money.

11.  Additionally, CS#1 stated that Patrick DISMUKES, a/k/a Dizzy, came to Ronnie Dale NOBLE'S trailer Thursday, January 18, 2007, and purchased an ounce of methamphetamine from NOBLE. CS#1 stated that DISMUKES returned the following Tuesday, January 23, 2007, and had about ½ ounce of methamphetamine in his possession. NOBLE subsequently bought two eight balls of the methamphetamine in DISMUKES

possession.   CS#1 identified Vito Rock FERRI, a/k/a Rocky
FERRI as a long time friend of NOBLE.   According to CS#1,
NOBLE "fronts" FERRI an ounce of methamphetamine weekly, or
whenever FERRI sells out of methamphetamine.

        12.   On January 30, 2007, DEA Special Agent JB
Hamilton and DEA Task Force Agent Joe Herman met with CS#1
at a prearranged meeting location in Autauga County,
Alabama.   The purpose of the meeting was to arrange an
undercover meeting with Ronnie Dale NOBLE.   At
approximately 4:40 pm TFA Herman instructed CS#1 to call
NOBLE'S cell phone, (334)202-0668 and ask NOBLE if he would
be able to supply CS#1 with a quantity of methamphetamine.
NOBLE answered the phone almost immediately.   During the
conversation, CS#1 stated to NOBLE that CS#1 had just
gotten off work and was on the way over to NOBLE'S house.
CS#1 asked NOBLE if he "had any", meaning methamphetamine.
NOBLE told CS#1 that he could take care of the CS#1.   This
consensual phone conversation was monitored and recorded by
TFA Herman who later downloaded it onto a compact disk
which was processed as evidence.

        13.   At approximately 4:45 pm SA Hamilton, Task Force
Agent Joe Herman, Autauga County Sheriff Deputies Jim

Steele and Ty Jones searched CS#1 and CS#1'S vehicle for
drugs and other contraband with negative results.  CS#1 was
then equipped with an audio recording device.  CS#1 was not
given any official authorized funds (OAF) to purchase
methamphetamine because, according to the CS#1, Ronnie Dale
NOBLE would front (give on consignment) CS#1 the
methamphetamine.

14.   CS#1 departed the meet location followed by SA
Hamilton and TFA Herman. At approximately 5:19 pm, TFA Tom
Reid observed CS#1 park in front of Ronnie Dale NOBLE'S
residence located at 448 County Road 68 East, Deatsville,
Alabama.  At approximately 6:40 pm, CS#1 called TFA Herman
and stated that he was leaving Ronnie Dale NOBLE'S
residence and that NOBLE had given CS#1 approximately and
eighth of an ounce of methamphetamine. CS#1 was followed
back to the meet location where, at approximately 6:43 pm,
CS#1 relinquished custody of a small clear zip-lock bag
containing a crystalline substance believed to be
methamphetamine to SA Hamilton and TFA Herman.  This bag of
methamphetamine was later processed into evidence.  The
methamphetamine CS#1 purchased from Ronnie Dale NOBLE was
subsequently submitted to the DEA laboratory in Dallas,

Texas for analysis.  The laboratory results indicated that the substance was 3.6 grams of methamphetamine.

15.   CS#1 explained that CS#1 had visited with Ronnie Dale NOBLE and several of his friends for nearly an hour. CS#1 asked NOBLE if he could supply CS#1 with methamphetamine.  NOBLE instructed CS#1 to follow him to NOBLE'S bedroom where NOBLE retrieved a bag.  According to CS#1, the bag was full of "8 ball" size bags of methamphetamine.  CS#1 further stated that NOBLE gave CS#1 one of the "8 ball" size bags and told CS#1 that he wanted $225.00 for it.  CS#1 told NOBLE that CS#1 would give him the money later.  CS#1 then departed the residence.

16.   Task Force Agent Herman removed the audio recording equipment from CS#1 and CS#1's vehicle. Both CS#1 and his vehicle were searched for contraband with negative results.  TFA Herman downloaded the recording of the meeting from the audio recording equipment and processed in into evidence.

17.   On Wednesday, January 31, 2007, at approximately 2:30pm DEA Task Force Agent Joe Herman and Autauga County, Alabama Sheriff's Sergeant Ty Jones met with CS#1, at the

13

meet location, for the purpose of making a controlled buy of methamphetamine from Ronnie Dale NOBLE. During this meeting, CS#1 was directed to pay NOBLE for the methamphetamine that NOBLE "fronted" the CS the previous evening, January 30, 2007.

18.    Agents established surveillance in the vicinity of Ronnie Dale NOBLE'S residence located at 448 County Road 68 East, Deatsville, Alabama. TFA Herman provided CS#1 with $1,225.00 of official funds to be used as payment to NOBLE for the methamphetamine acquired from NOBLE on January 30, 2007 and as payment to NOBLE for more methamphetamine. CS#1 and CS#1's vehicle were searched for contraband by Ty Jones with negative results.    Prior to departing for NOBLE'S residence, CS#1 made a consensually monitored telephone call to NOBLE, setting up the drug deal.    The telephone call was made to NOBLE'S residence.    CS#1 was provided a recorder to capture relevant conversation between CS#1 and NOBLE.

19.    At approximately 2:46pm, CS#1 departed the meet location for NOBLE's residence.    During this time, CS#1 was being followed by TFA Herman and DEA Special Agent Neill Thompson. CS#1 arrived at NOBLE'S residence located at 448

14

County Road 68 East, Deatsville, Alabama, at approximately 3:05pm.

20.    At approximately 3:26pm, CS#1 departed NOBLE'S residence and met TFA Herman and Deputy Jones at the meet location.    TFA Herman subsequently took custody of $100.00 official funds returned by CS#1, methamphetamine purchased by CS#1 and the technical equipment. In addition, Deputy Jones searched CS#1 and CS#1's vehicle with negative results.

21.    CS#1 was subsequently debriefed by agents and required to provide a written statement.    During the debriefing, CS#1 stated that upon CS#1's arrival at Ronnie Dale NOBLE'S residence, located at 448 County Road 68 East, Deatsville, Alabama, CS#1 noted that Johnny DAWKINS, Bart TATUM, Tom TAYLOR, and Tom CAMPBELL were present. CS#1 and NOBLE subsequently entered NOBLE'S trailer and the two went to NOBLE'S bedroom. CS#1 stated that CS#1 paid NOBLE $225.00 for the methamphetamine that NOBLE had "fronted" the CS the previous evening, January 30, 2007, and purchased an additional half ounce of methamphetamine for $900.00. (NOTE: CS#1 returned $100 in OAF to TFA Herman after leaving NOBLE's residence)

22.   Further, CS#1 stated that during the conversation
with Ronnie Dale NOBLE, CS#1 asked NOBLE for $1,000.00
worth of methamphetamine at which time NOBLE hesitated.
According to CS#1, NOBLE called Steven Wayne CATON to
ensure that NOBLE could get an ounce of methamphetamine
from CATON. After being assured NOBLE could get an ounce of
methamphetamine from CATON, NOBLE sold CS#1 that the
remaining amount of methamphetamine NOBLE possessed,
approximately one half ounce of methamphetamine.   NOBLE
told CS#1 that NOBLE wanted to be sure that he could get
more methamphetamine from CATON because NOBLE did not want
to run out like he had previously.   The methamphetamine
CS#1 purchased from Ronnie Dale NOBLE was subsequently
submitted to the DEA laboratory in Dallas, Texas for
analysis.    The laboratory results indicated that the
substance was 14 grams of methamphetamine.


23.   On February 09, 2007, DEA Special Agent JB
Hamilton and DEA TFA Joe Herman met with CS#1 at a
prearranged meeting location in Autauga County, Alabama.
The purpose of the meeting was to arrange an undercover
meeting with Ronnie Dale NOBLE.   At approximately 8:35 am
TFA Herman instructed CS#1 to call NOBLE at NOBLE'S

16

residence and ask NOBLE if he would be able to supply CS#1
with a quantity of methamphetamine. NOBLE'S girlfriend
answered the telephone and stated that NOBLE was in bed
asleep. This telephone conversation was monitored by TFA
Herman.

24.    Agents decided to send CS#1 to Ronnie Dale
NOBLE'S residence in an attempt to make contact with NOBLE.
At approximately 8:40 am TFA Joe Herman and Autauga County
Sheriff Deputy Ty Jones searched CS#1 and CS#1's vehicle
for contraband with negative results. CS#1 was then
equipped with an audio and video recording device. CS#1
was also given $1,800.00 of official authorized funds (OAF)
which had been recorded earlier to be used to purchase
methamphetamine.

25.    CS#1 left the prearranged meet location followed
by SA Hamilton and TFA Spivey. At approximately 9:05 am TFA
Spivey and SA Hamilton observed CS#1 park in front of
Ronnie Dale NOBLE'S residence located at 448 County Road 68
East, Deatsville, Alabama. Via the audio transmitter,
agents could hear CS#1 talking with a female for several
minutes. Eventually, at approximately 9:25 am, CS#1 could
be heard talking with NOBLE. At approximately 9:34 am,

17

CS#1 could be heard counting money. CS#1 later explained that NOBLE had just given CS#1 a small clear plastic zip-lock bag containing suspected methamphetamine and CS#1 was paying NOBLE.

26.    At approximately 9:40 am, CS#1 left NOBLE'S residence and returned to the meet location followed by SA Hamilton and TFA's Spivey and Herman. At approximately 10:00 am, CS#1 relinquished custody of a small clear zip-lock bag containing a crystalline substance believed to be methamphetamine to SA Hamilton and TFA Herman. This bag was later processed into evidence. The methamphetamine CS#1 purchased from Ronnie Dale NOBLE was subsequently submitted to the DEA laboratory in Dallas, Texas for analysis. The laboratory results indicate that the substance was 23.9 grams of methamphetamine.

27.    CS#1 explained that CS#1 had visited with Ronnie Dale NOBLE'S girlfriend for several minutes until NOBLE finally came out of his bedroom. CS#1 then asked NOBLE if he could supply CS#1 with an ounce of methamphetamine. CS#1 stated that NOBLE then went back into his bedroom and returned a couple of minutes later with methamphetamine. CS#1 stated that NOBLE gave CS#1 the methamphetamine and

18

CS#1 paid NOBLE $1,800.00.   CS#1 provided a written
statement regarding this transaction.

28.   TFA's Herman and Spivey removed the audio
recording equipment from CS#1 and CS#1's vehicle were
searched with negative results.   TFA Spivey was able to
download the recording of the meeting from the audio
recording equipment onto a compact disk which was processed
into evidence.   Your affiant is aware that in April of 2007
CS#1 ceased all communications with agents and deputies.
Agents have repeatedly attempted to contact CS#1 with no
success.

29.   On November 6, 2007, your affiant, TFA Eddie
Spivey and Deputy Sheriff Ty Jones interviewed CS#2
regarding Ronnie Dale NOBLE and his drug trafficking
operation.   Your affiant is aware that CS#2 does have a
criminal record.   CS#2 was arrested on August 13, 1976 in
Coosa County, Alabama for buy/receiving/concealing stolen
property.   On November 2, 1998 CS#2 was arrested for
Assault 1st degree in Autauga County, Alabama.   Your affiant
does not presently have any information regarding the
disposition of these arrests.   Your affiant is aware of the
fact that CS#2 has provided accurate and reliable

information regarding this investigation.  Further, your affiant is not aware of any misleading or false information that CS#2 has provided DEA.   During the interview, CS#2 stated that on October 31, 2007, CS#2 was at Ronnie NOBLE'S trailer, located at 448 County Road 68 East, Deatsville, Alabama.  Further, CS#2 stated that CS#2 observed small amounts methamphetamine and marijuana, as well as, drug paraphernalia.

30.  Your affiant has requested through an administrative subpoena records from Verizon Wireless on Ronnie Noble's account.  Such records revealed that Noble's billing address for his Verizon account is 448 County Road 68 East, Deatsville, Alabama.  Moreover, during the course of this investigation, your affiant and other investigators working with your affiant have surveilled Noble at said residence.

**WHEREFORE**, based upon the foregoing, your Affiant submits that probable cause exists to believe that there are enumerated papers, documents, photographs, books, ledgers, U.S. Currency, and pagers, more particularly described in Attachment B, located at and within the premises above described.

20

Devin Whittle
Special Agent
Department of Justice
Drug Enforcement Administration

SWORN TO AND SUBSCRIBED before me on the ___7th___ day of
November, 2007.

United States Magistrate Judge

21

## ATTACHMENT B

## PROPERTY TO BE SEIZED

(1)    Books, records, ledgers, and/or writings which record the receipt and/or distribution of controlled substances including marijuana as well as any other memoranda relating to the transportation, ordering, purchase, delivery and/or distribution of controlled substances, which writings and records are contraband as well as evidence;

(2)    Papers, tickets, notes, schedules, receipts, and other writings and objects including but not limited to gasoline receipts, air travel vouchers, and motel/hotel embossed articles, which do or tend to establish domestic and/or interstate travel in interstate commerce;

(3)    Addresses and/or telephone books and papers and other writings reflecting names, addresses, and/or telephone numbers as well as bills and paid receipts reflecting telephone toll records, any and all of which reflect the names, addresses, and telephone numbers of aliases or code names of both known and unknown co-conspirators in the above-described criminal activity, as well as other indicia of telephone usage and service including pay telephone usage which indicia includes, but is not limited to, telephone credit cards, large amounts of nickel, dime and/or quarter currency, and telephone paging devices which are carried on or about the persons to receive incoming notice or messages and which are activated by telephone usage;

(4)    Currency of the United States including paper and coin currency, also precious metals, jewelry, financial instruments, including but not limited to, negotiable commercial paper, and currency obtained, connected with and/or possessed to facilitate the financing of illicit drug trafficking;

(5)    Photographs and videotapes, in particular, photographs or videotapes of co-

conspirators, of assets, and/or of controlled substances;

(6)    Safes, strong boxes, and/or other secure receptacles for the maintenance of valuable items and/or important documents including books, records, and other writings as well as United States currency as described above, and any keys or other evidence of the existence and usage of any lockers, safety deposit boxes or other secure receptacles situated elsewhere than at defendant property;

(7)    Articles of false identification;

(8)    Radio electronic equipment including but not limited to transceivers, receivers, scanners, antennae, RF detectors, walkie talkies, wireless transmitters as well as other electronics which are used ancillary to such equipment, including but not limited to, electrical calibration equipment, meters and test equipment;

(9)    Computers or other electronic devices which are capable of storing information, including, but not limited to computers, lap tops, floppy disks, cd roms, zip disks, hard drives, and personal data assistants (PDA).

(10)  Firearms;

(11)  Controlled substances;

(12)  Paraphernalia for packaging, cutting, weighing, and distributing controlled substances, including but not limited to, scales, bags, pipes, and duct tape;

(13)  Any and all other material evidence of violations of Title 21, United States Code, Sections 841 (a) (1) and 846, together with fruits, instrumentalities and evidence of crimes at this time unknown.